UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------- x

JAMES W. DABNEY,

          Petitioner,

v.

HUGHES HUBBARD & REED LLP,

          Respondent.

Civil Action No. _____

**DECLARATION OF
JAMES W. DABNEY**

----------------------------------------------------------- x

    1.    My name is James W. Dabney. I am a member of the Bar of this Court and a Retired Partner in Hughes Hubbard & Reed LLP ("HHR"). A copy of my current HHR web bio as it appeared on the HHR website on March 21, 2023, is annexed hereto as Exhibit 1. I have personal knowledge of the matters stated in this declaration.

    2.    Annexed hereto as Exhibit 2 is a true copy of HHR's Restated Agreement of Partnership as amended December 1, 2014, and March 24, 2021 (the "Partnership Agreement").

    3.    Annexed hereto as Exhibit 3 is a true copy of HHR Policy Memorandum No. 3, relating to "Retirement," as it existed and was presented to me by HHR on or about November 1, 2021 (the "2021 PM3").

    4.    By letter dated June 25, 2021, I gave notice of intent to retire from HHR effective January 1, 2021. A copy of my retirement notice letter is annexed hereto as Exhibit 4.

    5.    By letter agreement dated November 15, 2021 (the "2021 Retainer Agreement"), HHR retained me to provide services to the Firm as a retired Partner. A true copy of 2021 Retainer Agreement, with certain financial terms redacted, is annexed hereto as Exhibit 5.

6. I retired from HHR effective January 1, 2022.

7. On January 24, 2022, HHR sent me a letter (the "January 24 Letter") which stated, among other things, that my monthly retirement benefit would be $3,113.83 if I elected the 75% joint survivor annuity option. A true copy of the January 24 Letter is annexed hereto as Exhibit 6.

8. On February 25, 2022, I signed and returned to HHR the pension "payment election form" which accompanied the January 24 Letter. A true copy of the signed pension "payment election form" is annexed hereto as Exhibit 7.

9. On February 25, 2022, after I had already signed and returned the pension "payment election form" which accompanied the January 24 Letter, HHR sent me an e-mail ("February 25 e-mail") stating that the Firm was cutting my monthly pension benefit by $417.50 per month, or by approximately 13.4%, to $2,696.83. A true copy of the HHR February 25 e-mail is annexed hereto as Exhibit 8.

10. According to the February 25 e-mail, when I attained age 65 on ████ 2019, the Firm intentionally discriminated against me, as compared with younger pension plan participants, by sending me what it called a "Suspension of Benefits Notice."

11. I never received any so-called "Suspension of Benefits Notice" and HHR, despite multiple requests, has failed to produce a copy of any such purported notice.

12. 29 U.S.C. § 623(i)(3) provides in relevant part (emphasis added):

> In the case of any employee who, as of the end of any plan year under a defined benefit plan, has attained normal retirement age under such plan . . . if distribution of benefits under such plan with respect to such employee has not commenced as of the end of such year in accordance with section 1056(a)(3) of this title and section 401(a)(14)(C) of Title 26, and the payment of benefits under such

2

plan with respect to such employee is not suspended during such plan year pursuant to section 1053(a)(3)(B) of this title or section 411(a)(3)(B) of Title 26, then any requirement of this subsection for continued accrual of benefits under such plan with respect to such employee during such plan year shall be treated as satisfied to the extent of any *adjustment in the benefit payable under the plan during such plan year attributable to the delay in the distribution of benefits after the attainment of normal retirement age.*

13. Consistently with the above-quoted statute, the $3113.83 monthly benefit stated in HHR's January 24 Letter to me actuarially adjusted my monthly benefit from age 65 to age 67.

14. In contrast, the $2,696.33 monthly benefit stated in HHR's February 25 e-mail does not contain any actuarial adjustment of my delayed pension benefit. On its face, the February 25 e-mail reflects intentional age discrimination under the above-quoted statute.

15. The Firm's reference to a purported "Suspension of Benefits Notice" appears to be an attempt to bring itself within the clause quoted above, "if . . . the payment of benefits under such plan with respect to such employee is not suspended during such plan year pursuant to section 1053(a)(3)(B) of this title or section 411(a)(3)(B) of Title 26."

16. The Firm's "Suspension of Benefits" theory is false and sham.

17. Annexed hereto as Exhibit 9 is a true copy of the Partners' Pension Plan of Hughes Hubbard & Reed as amended and restated January 1, 2017 (the "Plan").

18. The Plan specifically addresses the subject of "suspension of benefits" in Section 5.2 thereof. That section does not authorize "suspension" of benefits owed to a Participant who, like me, had not yet commenced receiving pension benefits.

19. Equally importantly, a legally effective "notice" of a "suspension" of pension benefits would have had to have been sent to me by personal delivery or first class mail and

3

to have contained specific information including "a general description of the plan provisions relating to the suspension of payments, and a copy of such provisions, and a statement to the effect that applicable Department of Labor regulations may be found in § 2530.203-3 of the Code of Federal Regulations." 29 C.F.R. § 2530.203-3(b)(4).

20. Despite multiple requests since February 25, 2022, HHR has persistently failed to produce any copy or contemporaneous record of the purported "Suspension of Benefits Notice" it relies on to escape age discrimination liability. The actuarial adjustment in the January 24 letter is powerful evidence that no such purported "suspension" notice was ever sent, and that HHR's contrary assertion is knowingly false and dishonest.

21. By e-mail dated November 29, 2022, HHR gave notice of its intent to terminate the 2021 Retainer Agreement effective February 1, 2023. A true copy of HHR's e-mail dated November 29, 2022, is annexed hereto as Exhibit 10.

22. By e-mail dated January 3, 2023, I exercised my right to become a "Retired Partner" under the HHR Partnership Agreement and paragraph 8 of the 2021 PM3. A true copy of my counsel's e-mail to HHR dated January 3, 2023, is annexed hereto as Exhibit 11.

23. On January 5, 2023, pursuant to Section 13.B of the HHR Partnership Agreement, a mediation was held before attorney John M. Townsend, an HHR Partner. A copy of my mediation submission to Mr. Townsend is annexed hereto as Exhibit 12. No resolution or agreement was reached at this mediation.

24. On January 6, 2023, I filed a charge of age discrimination with the United States Equal Opportunity Commission ("EEOC"). A true copy of my age discrimination charge filed with the EEOC is annexed hereto as Exhibit 13.

25. On February 1, 2023, HHR terminated the 2021 Retainer Agreement. At the time of this termination, I was lead counsel of record in the pending cases listed in Exhibit 14 hereto. I had been handling these cases as a retired Partner of HHR since January 1, 2022, under the original appearances that I had made in those cases. I had intended, and intend, to finish off these matters as clients have requested that I do, as a Retired Partner of HHR.

26. At approximately 3:55 p.m. on February 1, 2023, I was surprised to receive a letter from HHR which stated that my existing HHR e-mail address, telephone numbers, and Citrix access would be disabled and cut off in two days' time, on February 3, 2023. Annexed hereto as Exhibit 15 is a true copy of HHR's letter dated February 1, 2023.

27. HHR's threat to disable my existing HHR e-mail address, telephone numbers, and Citrix access was inconsistent with existing client obligations and my contractual rights as a "Retired Partner" in HHR. The HHR website lists thirteen (13) individuals who hold the title "Retired Partner," each of whom has HHR e-mail addresses and telephone numbers. Annexed hereto as Exhibit 16 are true copies of HHR "Retired Partner" web bios.

28. By e-mail dated February 3, 2023, my counsel objected to HHR's then-threatened cut-off of my existing HHR e-mail address, telephone numbers, and Citrix access at the close of business that day. A true copy of my counsel's February 3, 2023, e-mail to HHR is annexed hereto as Exhibit 17.

29. HHR did not disable or cut off my existing HHR e-mail address, telephone numbers, or Citrix access as it initially threatened to do on February 1, 2023; however, in an e-mail dated February 9, 2023, HHR renewed its threat to disable and cut-off my existing HHR e-mail address and telephone numbers and Citrix access. This time, HHR said that I could avoid

these adverse actions if I "promptly" agreed to refrain from "practicing law for clients apart from the Firm" and also agreed to refrain from "practicing through the Firm." A true copy of HHR's e-mail dated February 9, 2023, is included in the e-mail chain annexed hereto as Exhibit 18.

30. By return e-mail dated February 9, 2023, my counsel objected to HHR's threatened adverse actions as "fundamentally inconsistent with HHR's obligations to Mr. Dabney under the Partnership Agreement, the 2021 PM3, the duty of good faith that the Firm owes Mr. Dabney, and the duty to refrain from retaliation under 29 U.S.C. § 623(d). It is also contrary to client interests." A true copy of this e-mail is included in Exhibit 18 hereto.

31. HHR did not disable or cut off my existing HHR e-mail address, telephone numbers, or Citrix access as it threatened to do on February 9, 2023. By e-mail dated February 10, 2023, HHR requested a list of matters in which I was lead counsel of record. By e-mail dated February 13, 2023, my counsel provided HHR with the requested list. True copies of the parties' e-mail exchange of February 9 and 13, 2023, are reproduced in Exhibit 19 hereto.

32. Nine days later, on February 22, 2023, HHR issued a new threat to disable and cut-off my existing HHR e-mail address, telephone numbers and Citrix access. This time, HHR said it would keep my HHR e-mail address, telephone numbers, and Citrix access operative for "two weeks" to accommodate my getting "written confirmation from the clients (which I assume will be an easy ask by Jim (Patrice Jean in the case of ▬▬▬▬ that authorizes transfer of files and that they want Jim to continue to represent them alongside (or instead of) HHR." A true copy of HHR's e-mail dated February 22, 2023, is included in the e-mail chain reproduced in Exhibit 20 hereto.



33. By return e-mail dated February 23, 2023, my counsel drew HHR's attention to paragraph 8 of the 2021 PM3, which provides in part: "As long as a retired partner is not engaging in competition with the Firm, he or she shall be included in group life insurance and other group insurance coverage made available to partners in the Firm . . . ." HHR has never contended that my handling and finishing off cases as a Retired Partner of HHR constitutes "competition with the Firm." Apart from its "competition" provision, nothing in the Partnership Agreement nor the 2021 PM3 purports to restrict or prohibit a Retired Partner from practicing law as such, and with the dignity that the title "Retired Partner" connotes. My counsel wrote to HHR on February 23, 2023, stating: "Nothing in the 2021 PM3 justifies HHR's renewed threat to cut off Mr. Dabney's existing Firm email address and telephone number and Citrix access unless, within 'two weeks,' Mr. Dabney informs clients of HHR's ADEA litigation position and surrenders his rights under the 2021 PM3. Your demand that Mr. Dabney engage in such destructive and embarrassing acts is inappropriate, and is rejected." A true copy of this e-mail is included in the e-mail chain reproduced in Exhibit 20 hereto.

34. HHR did not disable or cut off my existing HHR e-mail address, telephone number, or Citrix access as it threatened to do, for a third time, on February 22, 2023. For more than three weeks, between February 23 and March 17, HHR did not reply to my counsel's e-mail of February 23, 2023. During this period, I continued to interact with clients, courts, colleagues, former students, and professional contacts as a "Retired Partner" in HHR, using my HHR e-mail address so indicating and my HHR mobile telephone number and Citrix access, in substantially the same way as I have done throughout my career of more than forty (40) years, and in conformity with applicable professional and ethical standards.





37.     Late in the day on Friday, March 17, 2023, HHR once again threatened, for a fourth time, to disable or cut off my existing HHR e-mail address, telephone numbers, and

Citrix access. This time, the threat was communicated through HHR outside counsel Kathleen M. McKenna of Proskauer Rose LLP. A true copy of attorney McKenna's letter dated March 17, 2023 (the "March 17 Letter"), is annexed hereto as Exhibit 25.

38. Using the same pressure tactic that was used in HHR's February 9 e-mail (*see* Exhibit 18 hereto), HHR's March 17 Letter states that I can avoid HHR's threatened adverse actions if withdraw my pending EEOC charge (*see* Exhibit 13 hereto), grant HHR a general release, and agree to perform services "for" HHR as if I were an HHR employee being paid a salary of approximately $35,000 per year. *See* Exhibit 25 at 2. HHR's March 17 Letter further states that if its terms are not accepted by March 22, 2023, HHR will "proceed" to disable or cut-off my existing HHR e-mail address, telephone numbers, and Citrix access. *Id*.

39. By letter dated March 21, 2022, my counsel demanded arbitration of claims against HHR arising under 29 U.S.C. §§ 623(a)(1), 623(d), 1132(a), and 1140, and the HHR Partnership Agreement. A copy of my demand for arbitration is annexed hereto as Exhibit 26 hereto. No arbitrator has yet been appointed to hear these claims.

40. HHR is threatening imminently to cause me (and itself) irreparable harm for which I have no adequate remedy at law. I cannot effectively discharge existing client responsibilities without continued, uninterrupted access to my existing HHR e-mail address, telephone numbers, and Citrix access. I am not in a position to discharge existing client responsibilities except by continuing to do so in the same manner as I have been doing since joining HHR in 2014. I know of no way to quantify, accurately or adequately, the value of the diminished quality of client services that HHR is threatening to cause, either in terms of harmed client interests or in terms of my own professional reputation.

41. HHR is threatening imminently to cause direct injury to my professional reputation and my rights as a litigant. I was a Partner in HHR between 2014 and 2021. I elected to retire from HHR and to claim the honorific "Retired Partner" in accordance with Section 11.D of the HHR Partnership Agreement (Exhibit 2 hereto) and the 2021 PM3 (Exhibit 3 hereto). By threatening to disable or cut off my existing HHR e-mail address, telephone numbers, and Citrix access, HHR is threatening to deprive me of my contractual rights as a "Retired Partner" and to humiliate me publicly. HHR is also, and unabashedly, using its threat of public humiliation to pressure me into withdrawing my pending EEOC charge (see Exhibit 13 hereto), to pressure me into waiving my rights to continued insurance coverages under the 2021 PM3 (see Exhibit 19 hereto ¶ 3), and to evade any legal test of whether HHR's purported freeze of my pension benefits in 2019 was wrongful and actionable under 29 U.S.C. §§ 623(a)(1) and (i)(3). I know of no way to quantify, accurately or adequately, the value of the injury to my professional reputation and the loss of litigant's rights that HHR is threatening to cause.

42. The preliminary injunction sought by me would cause no harm to HHR. I ask for nothing more than that preservation of a status quo that has existed for more than eight (8) years including the more than fourteen (14) months since I retired from HHR on January 1, 2022. It was HHR which chose, peremptorily and unilaterally, to terminate the 2021 Retainer Agreement (see Exhibits 5, 10 hereto), leaving in place the default provisions of paragraph 8 of the 2021 PM3. Those default provisions entitle me to elect "Retired Partner" status and to be included in group insurance coverages made available to Partners in HHR, subject only to my not engaging in "competition with the Firm" (Exhibit 3 hereto ¶ 8). Since retiring from HHR on January 1, 2022, I have maintained client confidences and complied with applicable legal and

professional duties as I have throughout my more than 40-year-long career, even though the 2021 Retainer Agreement (Exhibit 5) was silent on those subjects. Annexed hereto as Exhibit 27 of a photograph of current and former HHR attorneys who attended the Annual Dinner of the William C. Conner Inn of Court on January 23, 2023. My guest that evening was Judge Brian Cogan, who was on the *Cornell Law Review* with me between 1977 and 1979.

43. The preliminary injunction sought by me would also, in my view, advance public interests in the stability of contracts and enforcement of statutory prohibitions against age discrimination. Absent interim relief from this Court, HHR clients are threatened with irreparable harm to pending causes. Absent interim relief from this Court, alleged willful misconduct on the part of HHR pension administrators may go unredressed and unpunished.

I, James W. Dabney, hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: March 2̲1̲, 2023.


James W. Dabney

