# EXHIBIT 12

VLADECK, RASKIN & CLARK, P.C

ANNE L. CLARK
212.403.7332
ACLARK@VLADECK.COM

**PRIVILEGED AND CONFIDENTIAL**
**FOR SETTLEMENT PURPOSES ONLY**

December 16, 2022

**By Email**

John M. Townsend, Esq.
Hughes Hubbard & Reed
1775 I Street, N.W.
Washington, DC 20006

Re:    Mediation: James W. Dabney and Hughes Hubbard and Reed LLP

Dear Mr. Townsend:

We write on behalf of James W. Dabney in advance of the mediation with Hughes Hubbard & Reed LLP (the "Firm") scheduled for January 5, 2023. The issue to be mediated is the Firm's refusal to pay the pension benefits that were identified in its letter to Mr. Dabney dated January 24, 2022 (the "January 24 Letter").[1]

Section 5.1.1 of the Partners' Pension Plan of Hughes Hubbard & Reed LLP (the "Plan") provides:

> 5.1.1   Normal Retirement Benefits.   A Participant's benefits upon Normal Retirement shall be equal to his or her Retirement Benefit as of the first day of the month coincident with or next following his or her Termination of Employment. The Participant's Benefit Commencement Date shall be the first day of the month coincident with or next following his or her Termination of Employment. The Participant shall not be entitled to any benefits under this Section 5.1.1 unless he or she shall survive until his or her Benefit Commencement Date.

Firm Policy Memorandum No. 3 provides in part: "Normal Retirement Date. A partner shall retire on the last day of the fiscal year . . . [i]n which the partner attains age 60, 61, 62, 63, 64, 65, 66, 67, 68 or 69, if the partner has given the Executive Committee at least six

---

[1] This letter supplements the appeal letter filed on Mr. Dabney's behalf on August 26, 2022 (with attachments), and addresses the new theories put forward, for the first time, in the Firm's letter dated October 25, 2022 (the "October 25 Letter") communicating its final denial.

John M. Townsend, Esq.
December 16, 2022
Page 2

months prior written notice of his or her intention to retire on such date." It is undisputed that Mr. Dabney (i) attained age 67 on ▮▮▮▮, 2021; and (ii) gave the Executive Committee more than six months prior written notice of his intention to retire effective January 1, 2022.

The Plan defines "Normal Retirement" as "Termination of Employment of a Participant on or after Normal Retirement Age," which the Plan defines as "Age 65." Under Policy Memorandum No. 3, Mr. Dabney's "Normal Retirement Date" was December 31, 2021; and under the Plan, Mr. Dabney's "Normal Retirement" and "Termination of Employment" also occurred on December 31, 2021—as the Firm acknowledged and admitted, twice, in formal correspondence sent to Mr. Dabney on Firm letterhead.

The January 24 Letter and the Firm's subsequent letter to Mr. Dabney dated February 25, 2022 (the "February 25 Letter") both identify Mr. Dabney's "Date of Termination" as being "12/31/21." The "Date of Termination" identified in the January 24 Letter and the February 25 letter was Mr. Dabney's "Termination of Employment" date under the Plan.

The January 24 Letter and the February 25 Letter also both identify Mr. Dabney's "Benefit Commencement Date" as being "03/01/22." Under Plan Section 5.1.1, "[t]he Participant's Benefit Commencement Date shall be the first day of the month coincident with or next following his or her Termination of Employment." Here again, the January 24 Letter and the February 25 Letter both formally acknowledge and admit that Mr. Dabney's "Termination of Employment" had occurred for purposes of the Plan.

The January 24 Letter and the February 25 Letter also both identify "pension benefit amounts." Plan Section 3.1(a) provides that the amount of a Participant's pension benefit is calculated by reference to his or her "Severance from Service Date," which the Plan defines in relevant part as "the date on which an Employee quits, retires, is discharged or dies." Here again, the January 24 Letter and the February 25 Letter both formally acknowledge and admit that "12/31/21" was Mr. Dabney's "Severance from Service Date" under the Plan.

In its zeal to avoid paying the pension benefits identified in the January 24 Letter, the Firm has violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, and has clearly breached its duty to act in good faith toward Mr. Dabney.

<u>The Firm's Compliance With, and Subsequent Violation of, 29 U.S.C. § 623</u>

Plan Section 5.1.1 required the Firm to calculate the amount of Mr. Dabney's "Retirement Benefit as of the first day of the month coincident with or next following his or her Termination of Employment." In doing so, the Firm had to comply not only with ERISA and the Internal Revenue Code ("IRC"), but the ADEA. The January 24 Letter did just that.

Mr. Dabney attained age 65 on ▮▮▮▮, 2019. Under the Plan definition of "Normal Retirement Date," Mr. Dabney's Normal Retirement Date ("NRD") was ▮▮▮▮ 2019. This NRD was stated in the January 24 Letter (and in the February 25 Letter).

John M. Townsend, Esq.
December 16, 2022
Page 3

>29 U.S.C. § 623(a)(1) provides in part:

>It shall be unlawful for an employer— (1) to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age. . . .

The above-quoted provision would be implicated by a Plan that discriminated against an individual with respect to his pension benefits because of his attaining a certain age. 29 U.S.C. § 623(i)(3) prescribes an exception to the above-quoted general prohibition, which provides in relevant part (emphasis added):

>In the case of any employee who, as of the end of any plan year under a defined benefit plan, has attained normal retirement age under such plan . . . if distribution of benefits under such plan with respect to such employee has not commenced as of the end of such year in accordance with section 1056(a)(3) of this title and section 401(a)(14)(C) of Title 26, and the payment of benefits under such plan with respect to such employee is not suspended during such plan year pursuant to section 1053(a)(3)(B) of this title or section 411(a)(3)(B) of Title 26, then any requirement of this subsection for continued accrual of benefits under such plan with respect to such employee during such plan year shall be treated as satisfied to the extent of any *adjustment in the benefit payable under the plan during such plan year attributable to the delay in the distribution of benefits after the attainment of normal retirement age.*

In this case, the January 24 Letter brought the Firm into compliance with the above-quoted provisions. The Plan is a "defined benefit plan." As of December 31, 2019, Mr. Dabney was an "Employee" under the Plan who had attained "Normal Retirement Age" under the Plan. The Firm had not commenced paying pension benefits to Mr. Dabney as of December 31, 2019. Although the Plan Section 5.2 permits suspension of benefits in certain circumstances, that provision did and does not apply to a Participant who, like Mr. Dabney, had not commenced receiving benefits. Thus, in accord with the above-quoted 29 U.S.C. § 623(i)(3) and the terms of the Plan, the January 24 Letter provided for "adjustment in the benefit payable under the plan during such plan year attributable to the delay in the distribution of benefits after the attainment of normal retirement age."

At 8:03 p.m. on February 25, 2022, after Mr. Dabney had signed and returned the payment election forms which had accompanied the January 24 Letter, Christina Pakidis, the Firm's Pension Manager, sent an e-mail to Mr. Dabney which stated in part: "In October 2019, you received a Suspension of Benefits Notice informing you that your benefit in the Partners' Pension Plan would not increase if you started taking your benefit after the Normal Retirement Age of 65. Inadvertently, the original paperwork you received, actuarially increased your benefit

John M. Townsend, Esq.
December 16, 2022
Page 4

from age 65 to 67. This was an error and that is why you are receiving revised forms to complete."

By the above-quoted e-mail, the Firm apparently was attempting to invoke the 29 U.S.C. § 623(i)(3) language, "if . . . the payment of benefits under such plan with respect to such employee is not suspended during such plan year pursuant to section 1053(a)(3)(B) of this title or section 411(a)(3)(B) of Title 26 . . . ." To accomplish this, the Firm represented to Mr. Dabney that "[i]n October 2019" he purportedly had "received," somehow, from some unnamed person, a "Suspension of Benefits Notice" that purportedly operated to forfeit some of the pension benefits that the January 24 Letter had identified. The Firm will press this position at its peril.

To begin, as noted above, the Plan does not authorize "suspension of benefits" except under Plan Section 5.2; and the Firm has conceded (October 25 Letter at 4 n.2) that Plan Section 5.2 did not authorize the purported "Suspension of Benefits Notice" referred to in Ms. Pakidis's February 25 e-mail. Whether or not the Plan might legally have provided for such a suspension of Mr. Dabney's pension benefits is irrelevant. It did not and does not.

Equally importantly, there is no evidence that the Firm ever sent Mr. Dabney a notification compliant with 29 C.F.R. § 2530.203-3, the regulations promulgated pursuant to 29 U.S.C. § 1053(a)(3)(B).[2] Such a notice would have to have been sent by personal delivery or first class mail and to have contained specific information including "a general description of the plan provisions relating to the suspension of payments, and a copy of such provisions, and a statement to the effect that applicable Department of Labor regulations may be found in § 2530.203-3 of the Code of Federal Regulations." 29 C.F.R. § 2530.203-3(b)(4).

The Firm's claim that it somehow lost or destroyed all copies of a purported "Suspension of Benefits Notice" is not credible. The January 24 Letter, and the pension benefit calculation set forth in that letter, are strong evidence that the Firm *did not* purport to "suspend" Mr. Dabney's pension benefits in 2019 (which the Plan did not even authorize) and this fact, not any supposed error or mistake, explains why the Firm, in its January 24 Letter, "actuarially increased your [Mr. Dabney's] benefit from age 65 to 67," to quote Ms. Pakidis. The increase was required by the plain terms of 29 U.S.C. § 623(i) quoted above. *See also* 26 U.S.C. § 411(b)(1)(H)(iii)(II) (minimum vesting standard under the IRC).

On pages 6–8 of its October 25 Letter, the Firm asserts that a qualified pension plan can in theory provide for "forfeitures" (*id*. at 7) of pension benefits that are otherwise owed to Participants who work past age 65. The short answer to the Firm's argument is: the Plan does not authorize the type of pension "forfeitures" that it now, belatedly, is trying to claim; and at all events, the Firm has failed to produce any evidence that it ever prepared, delivered, or mailed a

---

[2] The "evidence" that the Firm relies on to justify its position consists of characterizations of hearsay statements allegedly made by unnamed person(s) at Wells Fargo. *See* October 25 Letter at 8 n.9. The Firm's reliance on such "evidence" speaks volumes.

John M. Townsend, Esq.
December 16, 2022
Page 5

"Suspension of Benefits Notice" that could have enabled it to bring about the pension benefits "forfeiture[]" that the Firm attempted to induce Mr. Dabney to accept on February 25, 2022, persistently refused to explain over a 7-month period, and then, in its October 25 Letter, attempted to justify on the basis of complex new ratiocinations that contradict the Plan terms and are unsupported by contemporaneous documentary evidence.

Should Mr. Dabney be forced to take this matter to arbitration, the Firm will be in the embarrassing position of arguing that (i) in 2019, the Firm attempted to cut Mr. Dabney's pension benefits in a manner not authorized by the Plan; (ii) the Firm did not retain, or has lost or destroyed all copies of, a purported "Suspension of Benefits Notice" by means of which the Firm attempted to implement the pension benefit cut; and (iii) the pension benefits stated in the January 24 Letter purportedly were a product of error or mistake (October 25 Letter at 6 n.6), as opposed to being what 29 U.S.C. § 623(i) plainly required in the circumstances. In our view, any arbitrator hearing this matter is likely to conclude that the Firm's assertion that it sent an extra-Plan "Suspension of Benefits Notice" to Mr. Dabney is bad faith conduct.

The Firm's Refusal to Pay Any Pension Benefits to Mr. Dabney

As of the time of its February 25 Letter to Mr. Dabney, the Firm was still acknowledging that Mr. Dabney's "Date of Termination" was "12/31/21" and that Mr. Dabney's "Benefit Commencement Date" was "03/01/22." It apparently had not yet occurred to the Firm to try and argue that Mr. Dabney's Normal Retirement had never happened, with the purported result that Mr. Dabney's "Benefit Commencement Date" was not known or knowable.

On April 8, 2022, Mr. Cruse orally communicated to Mr. Dabney, for the first time, that the Firm was backtracking from even the position stated in the February 25 Letter and was taking the position that the Firm's Retainer Agreement with Mr. Dabney operated, somehow, to disentitle Mr. Dabney from receiving any pension benefits indefinitely.

In an e-mail to Mr. Cruse dated April 11, 2022, Mr. Dabney stated: "I was surprised to hear you say on April 8 that the Firm is now taking the position that our retainer agreement excuses it from making even the reduced pension payments that were presented to me on February 25. I have no idea what legal rationale may underpin this position, which conflicts with even the February 25 position, but invite you to provide a written explanation."

Over the next two months, the Firm persistently refused to provide the requested "written explanation" of its changed position concerning Mr. Dabney's pension benefits. In an e-mail dated April 11, 2022, Mr. Cruse asserted: "You are misstating the facts again about what was said." Mr. Cruse did not provide any alternative version of "what was said."

Mr. Cruse arranged a conference call among himself, Mr. Dabney, and Mr. Harrison. Mr. Harrison asserted Mr. Dabney was covered by Plan Section 2.4, which states: "Transfer to Ineligible Status. A Participant who remains an Employee but ceases to be an Eligible Employee shall cease active participation in the Plan." In fact, as the Firm has since

John M. Townsend, Esq.
December 16, 2022
Page 6

conceded, upon his retirement Mr. Dabney ceased to be an "Employee," within the meaning of the Plan, as of December 31, 2021.

In a letter dated June 28, 2022 (the "June 28 Letter"), Mr. Harrison put forward an entirely new and different theory for repudiating both the "Date of Termination" and the "Benefit Commencement Date" set forth in the January 24 Letter (and the February 25 Letter). The June 28 Letter asserts that the Plan definition of "Termination of Employment, *i.e.*, "[t]he voluntary or involuntary severance of Employment," purportedly does not denote a *legal relationship* (*i.e.*, that of "Employer" and "Employee" as defined in the Plan), but rather purportedly denotes *services* provided by *non*-Employees after their "Severance from Service Date." Further, the Firm would have an arbitrator re-write the Retainer Agreement so that it provides, not that the Firm "retained" Mr. Dabney to provide services "to" the Firm as a "retired Partner," rather than the Firm "employed" Mr. Dabney to provide services "for" the Firm.

The Firm's invocation of Plan Section 10.2 does not insulate it from liability for breach of the Plan's plain terms and for the Firm's bad faith attempt to cut Mr. Dabney's pension benefits. The theories advanced in the June 28 Letter and the October 25 Letter make nonsense of the Plan definitions of "Normal Retirement" and "Severance from Service Date." The Firm has not just repudiated the pension obligations that it formally acknowledged in the January 24 Letter, but the Firm has humiliated Mr. Dabney by falsely suggesting, both internally and externally, that Mr. Dabney did not retire but, rather, was de-equitized and demoted.

The Firm's Termination of the Retainer Agreement

On November 29, 2022, the Firm gave notice of its intent to terminate the parties' Retainer Agreement effective February 1, 2023. The Firm has made its bed.

Resolution

Mr. Dabney is prepared to release the Firm of any claim he may have for violation of the ADEA, ERISA, or Plan obligations in exchange for the Firm paying the pension benefits promised in the January 24 Letter with accrued statutory interest and reasonable attorneys' fees. We hope that with your assistance we are able to reach a resolution and avoid arbitration.

Very truly yours,

*/s*

Anne L. Clark

ALC:hs
cc: Michael E. Salzman, Esq. (by email)

1258767 v1