```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/6/2023
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JAMES W. DABNEY,

                      Petitioner,

-against-

HUGHES HUBBARD & REED LLP,

                      Respondent.

1:23-mc-78 (MKV)

**ORDER DENYING
PRELIMINARY INJUNCTION**

---

MARY KAY VYSKOCIL, United States District Judge:

    Petitioner James Dabney seeks a preliminary injunction against Respondent Hughes Hubbard & Reed, LLP ("Hughes Hubbard" or the "Firm"), the law firm from which Dabney recently retired as a Partner. Dabney and Hughes Hubbard have agreed to arbitrate various claims that Dabney asserted following his retirement, including the claim that Hughes Hubbard's threat to disable or cut off Dabney's existing email address, telephone number, and Citrix access (the "Firm Systems") amounts to a breach of the implied covenant of good faith and fair dealing contained in the Hughes Hubbard Partnership Agreement, and violates various federal laws prohibiting retaliation against employees. Dabney now seeks to enjoin the Firm from disabling his access to the Firm Systems pending arbitration of his claims. For the reasons discussed below, the motion is denied.

## PROCEDURAL HISTORY

    Dabney commenced this action on March 21, 2023, seeking by order to show cause a preliminary injunction in aid of arbitration. [ECF No. 9-3].[1] On March 24, 2023, a Consent Order

---

[1] Dabney filed this matter entirely under seal pursuant to authorization dated March 22, 2023, granted by Judge Crotty, who was then presiding in Part I. The Court lifted the seal in this matter at a status conference held on April 11, 2023, and memorialized the unsealing in a written order later that day. [ECF No. 7]. The delayed public filing of the documents in this matter have resulted in ECF numbers which are somewhat jumbled, and not always reflective of the order in which the documents in this matter were submitted to the Court.

was entered pursuant to which Hughes Hubbard "agreed, until the hearing date of petitioner's motion for preliminary injunction," that it would "(i) maintain petitioner's existing [Hughes Hubbard] e-mail address; (ii) maintain petitioner's existing [Hughes Hubbard] telephone numbers; and (iii) maintain petitioner's existing Citrix access." Dabney Decl. II, Ex. 2. The Consent Order also provided a schedule pursuant to which briefing would conclude on or before April 18, 2023.[2] Dabney Decl. II, Ex. 2.

On May 15, 2023, after briefing concluded, the parties appeared for an evidentiary hearing on the pending motion. At the hearing, the Court received into evidence each of the declarations submitted by the parties and the exhibits attached thereto. *See infra* at n.3. The Court also heard testimony from Dabney and from Theodore V.H. Mayer, the Chair of Hughes Hubbard. At the conclusion of the hearing, the Court reserved decision and directed the parties to maintain the status quo pending the Court's ruling, *i.e.*, Dabney's access to Firm Systems was not to be disabled or otherwise disrupted between the date of the hearing and the issuance of a decision. This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rules 52(a) and 65 of the Federal Rules of Civil Procedure.

## FACTUAL BACKGROUND[3]

James Dabney was an equity Partner with the law firm Hughes Hubbard from 2014 until he retired on January 1, 2022. Dabney Decl. I ¶¶ 6, 41; Tr. 61:1-2. Dabney's relationship with

---

[2] The timely filed briefing included: Dabney's Memorandum of Law in Support of the Order to Show Cause [ECF No. 9-2] ("Pet. Br."), the Opposition brief from Hughes Hubbard [ECF No. 13] ("Opp."), and Dabney's Reply [ECF No. 11] ("Reply"). This briefing was accompanied by numerous declarations, including the First Declaration of James W. Dabney in Support of Petitioner's Motion [ECF No 10.] ("Dabney Decl. I") and attached exhibits; the First Declaration of Theodore V.H. Mayer in Support of Respondent's Opposition [ECF No. 14] ("Mayer Decl. I") and attached exhibits; the Declaration of Christina Pakidis in Support of Respondent's Opposition [ECF No. 15] ("Pakidis Decl.") and attached exhibits; the Declaration of Kathleen McKenna in Support of Respondent's Opposition [ECF No. 16] ("McKenna Decl.") and attached exhibit; and the Second Declaration of James W. Dabney [ECF No. 12] ("Dabney Decl. II") and attached exhibits.

[3] The facts alleged herein are drawn from the evidentiary record, consisting of the declarations and exhibits of the parties and the evidence and testimony admitted at the May 15, 2023 hearing on Dabney's motion. Citations to the

the Firm during this period was governed by a Partnership Agreement, which explained (via an incorporated policy memorandum) that a partner, upon retirement, is entitled to become either "Senior Counsel" to the Firm or a "Retired Partner" of the Firm. Dabney Decl. I ¶¶ 2-3, Ex. 3 ¶ 8; Tr. 45:18-23. Those who elect the position of Senior Counsel receive certain benefits, including office space and secretarial assistance, but they must also satisfy certain requirements, such as remaining registered and in good standing as a member of the Bar and remaining in compliance with the Firm's restrictions on securities trading and confidentiality.[4] Mayer Decl. I at 11.

For the first year after his retirement, Dabney provided legal services to the Firm under the title "Of Counsel" (the functional equivalent of "Senior Counsel") pursuant to the terms of a Retainer Agreement. Dabney Decl. I ¶¶ 5, 21, 25 & Ex. 5. Dabney explained that he requested this title, unique at Hughes Hubbard, because when he was an Associate with the law firm Sullivan & Cromwell in the 1980s, partners upon retirement were given the honorific "Of Counsel." Dabney Decl. II ¶ 17. Dabney considered the title Of Counsel to be more prestigious than the designation of Senior Counsel. Tr. 87:15-18. During this period, Dabney was financially compensated for his work pursuant to the Retainer Agreement.

At some point, a disagreement surfaced between Dabney and the Firm concerning his retirement benefits, which led Dabney to file a charge of age discrimination against Hughes

---

transcript of the May 15 hearing will be referred to as "Tr." The record also includes the declarations and attached exhibits filed in connection with the parties' briefing, *see supra* n.2, and the following post-briefing declarations: the Second Declaration of Theodore V.H. Mayer [ECF No. 23] ("Mayer Decl. II") and attached exhibits; and the Declaration of Michael E. Salzman [ECF No. 21] ("Salzman Decl."). While the Court overruled Dabney's objection that the Second Mayer Declaration and the Salzman Declaration should be precluded from evidence as being untimely submitted, the Court notes that those declarations (and accompanying exhibits) had no bearing on the outcome of Dabney's motion for injunctive relief.

[4] The contractual terms associated with the title "Senior Counsel" are included in an "addendum" to the policy memorandum. Mayer Decl. I at 11. Dabney initially disputed that the policy memorandum contained an addendum, and, in support of his contention, offered as an exhibit a version of the policy memorandum without said addendum. Dabney Decl. I, Ex. 3; Dabney Decl. II, Exs. 4-5. But at the preliminary injunction hearing, Dabney effectively conceded that the version he had relied upon was outdated, and that the version attached to the Mayer Declaration was correct. Tr. 58:21-59:9.

3

Hubbard with the Equal Employment Opportunity Commission ("EEOC").  Dabney Decl. I ¶¶ 12-13 & Exs. 12-13.  (The details of these allegations, though discussed at length by the parties, are not particularly relevant for the purposes of this motion.)

On January 3, 2023, several days before filing his age discrimination charge with the EEOC, Dabney's counsel emailed Hughes Hubbard to request that Dabney's status as Senior Counsel "be terminated not later than January 31, 2023, and that he be treated thereafter as a 'Retired Partner.'"  Dabney Decl. I, Ex. 11; Tr. 56:7-12.  On February 1, 2023, Hughes Hubbard (seemingly in response to the email from Dabney's counsel) terminated the Retainer Agreement.  Dabney Decl. I ¶ 25; Tr: 14:1-2.  That same day, Hughes Hubbard informed Dabney that it planned to disable or cut off his existing email address, telephone number, and Citrix access on February 3, 2023.  Dabney Decl. I ¶ 26, Ex. 15.  That timeline for disabling access was repeatedly pushed back, however, as Dabney's counsel objected to the disablement as a violation of the covenant of good faith and fair dealing contained in the Partnership Agreement, and also as a form of illegal retaliation.  Dabney Decl. I ¶¶ 27-36.

On March 17, 2023, Hughes Hubbard sent a letter advising Dabney that "[e]ffective April 1, 2023, the Firm will consider Mr. Dabney to be a Retired Partner."  Dabney Decl., Ex. 25 at 2.  The letter went on to state that Dabney's "email and phone access will end" on April 1, 2023, "consistent with the Firm's past practices (with the exception of a few very senior Retired Partners who have not been active for years)."[5]  Dabney Decl., Ex. 25 at 2.  Hughes Hubbard explained, however, that in the event that Dabney should wish to continue providing services for the Firm beyond March 30, 2023, he may continue as Senior Counsel, in which case he could receive

---

[5] This letter does not say anything about Dabney's access to Citrix.  However, it is clear from the briefing, other letters filed as exhibits, and from the testimony at the evidentiary hearing, that Citrix access is also to be terminated.

4

pension benefits as if he were a Retired Partner, a lump sum payment of $75,000, insurance coverage, and continued phone and email access. Dabney Decl., Ex. 25 at 3. However, the Hughes Hubbard letter stated that as a condition for this latter option, Dabney would have to (i) withdraw his pending EEOC charge, (ii) grant Hughes Hubbard a "general release," and (iii) perform services exclusively for Hughes Hubbard. Dabney Decl. I ¶¶ 37-38 & Ex. 25.

On March 21, 2023, Dabney initiated arbitration proceedings pursuant to the Partnership Agreement. Dabney Decl. I ¶ 39, Ex. 26. No arbitrator has yet been appointed to hear his claims. Tr. 9:20-25. In the meantime, Dabney has continued to use the Firm's name and resources to work on various matters which were pending prior to his retirement. Tr. 13:16-15:15; 72:5-12. For at least one of these matters, Dabney directly billed the client for his own personal gain, without notice to or the consent of Hughes Hubbard. Tr. 72:5-73:18; 77:2-15. Dabney commenced this case seeking injunctive relief in aid of arbitration the same day he demanded arbitration.

## DISCUSSION

### I. JURISDICTION

A threshold issue is the proper role of this Court in this proceeding. Dabney previously filed a demand for arbitration and Hughes Hubbard does not dispute that arbitration is proper. As such, the preliminary injunction sought is one in aid of arbitration—rather than one coupled (as is often the case) with a motion to compel arbitration. However, an arbitrator has yet to be appointed and, at the preliminary injunction hearing, counsel could not estimate with any degree of certainty when one would be named. Tr. 9:21-10:3.

With the arbitrator not yet in place and no emergency relief mechanism available through the arbitration tribunal,[6] there is compelling justification for the Court to address and resolve this

---

[6] The Partnership Agreement provides that "the arbitration will be conducted in New York City according to the Federal Arbitration Act and the Non-Administered Arbitration Rules in effect at the time of the Dispute of the CPR

5

issue now, lest damage be done to either party in the interim.  Moreover, under settled doctrine in this Circuit, the fact that a case is committed for merits resolution in arbitration does not prevent the Court from granting emergency relief.  *See Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith*, 910 F.2d 1049, 1053 (2d Cir. 1990).  The Court retains the power to issue injunctive relief in order to maintain the viability of the arbitration and protect against irreparable harm.  *See Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010).

## II.     MOTION FOR A PRELIMINARY INJUNCTION

The overarching dispute between Dabney and Hughes Hubbard revolves around pension benefits and whether (and in what amount) Dabney was entitled to such benefits while he continued to practice law at the Firm.  The Parties' briefing in this case refers repeatedly to this broad pension-based dispute, seemingly jockeying for advantage on that issue—or simply unable to set it aside.  However, the pending motion for injunctive relief is about something much more narrow: whether Hughes Hubbard may disable or cut off Dabney's existing email address, telephone number, and Citrix access (the "Firm Systems") before arbitration has concluded, when Dabney asserted in his demand for arbitration that the threat to disable the Firm Systems amounted to a breach of the implied covenant of good faith and fair dealing contained in the Hughes Hubbard Partnership Agreement, and was a violation of various federal laws prohibiting retaliation against employees.

To prevail on his motion for a preliminary injunction, Dabney must demonstrate: "(1) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in [his] favor; (2) a

---

Institute for Dispute Resolution."  Dabney Decl. I, Ex. 2 at 14.  While the Non-Administered Arbitration rules of the CPR Institute for Dispute Resolution ("CPR") currently provide a mechanism for emergency relief, the Parties explained during the preliminary injunction hearing that such relief would not be available to them because they were not using a panel from CPR to administer the arbitration.  Tr. 10:4-11:20.

6

likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in [his] favor; and (4) that the public interest is not disserved by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (internal quotation marks omitted) (alterations adopted).  The motion for preliminary injunction must be denied if Dabney fails to demonstrate any one of these elements.  *See Willis re Inc. v. Herriott*, 550 F. Supp. 3d 68, 85 (S.D.N.Y. 2021).  Because Dabney cannot meet his burden with respect to several of these elements, his motion for a preliminary injunction fails on several grounds.

      **a. Irreparable Harm**

The Second Circuit has described the issue of irreparable harm as "the single most important prerequisite for the issuance of a preliminary injunction."  *JTH Tax, LLC v. Agnant*, 62 F. 4th 658, 672 (2d Cir. 2023) (internal quotation marks omitted).  To satisfy this element, Dabney "must demonstrate that absent a preliminary injunction [he] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of [arbitration] to resolve the harm."  *Id.* at 66.  To that end, Dabney asserts that he will suffer irreparable harm if his access to Firm Systems were to be terminated because (a) his professional reputation will be damaged and (b) his ability to serve his clients will be diminished.  The Court is not persuaded.

With respect to purported reputation harm, it is clear that Dabney takes pride in his profession and the practice he has built.  He has spent decades practicing law at a series of well-regarded New York City law firms, most recently concluding with seven years as a Partner with Hughes Hubbard.  Dabney achieved a great deal of success throughout these decades of work, including several victories at the United States Supreme Court.  Dabney Decl. I, Ex. 23.  While Dabney was confident that he had more to offer the Firm, he elected to retire at the end of 2021

out of a desire to leave at the top of his game, as done (in Dabney's view) by baseball player Sandy Koufax.  Tr. 22:4-21.

But Dabney did not stop practicing law.  For the year following his retirement from the Partnership, Dabney continued to practice at Hughes Hubbard under the title "Of Counsel" pursuant to the terms of the Retainer Agreement.  He continued practicing—apparently with the Firm's knowledge—even after asking to become a "Retired Partner," and after the Retainer Agreement had been terminated.  For instance, Dabney worked with other Hughes Hubbard personnel on a Ninth Circuit appeal, provided legal advice via his Hughes Hubbard email account in connection with that appeal, and listed his name on a recently filed appellate brief in that matter as a Hughes Hubbard attorney.  Tr. 18:24-19:14; 72:13-20.  Thereafter, Hughes Hubbard asked that Dabney bill the client for the services that he and the other Hughes Hubbard employees provided on that matter.  Tr. 19:15-20; 72:5-73:18; 77:2-15.  Instead, as came to light for the first time at the Hearing, Dabney billed his time directly to the client for his own personal gain—supposedly with the permission of the client, but without the knowledge or consent of the Firm. Tr. 72:5-73:18; 91:3-9.  This conduct demonstrates Dabney's desire to have it both ways: he wants to be retired while still practicing; to be affiliated with Hughes Hubbard with no retainer agreement or other obligations to the Firm; and to use Firm resources while billing clients directly for his own benefit.

This is not going out like Koufax.  Retiring has consequences, and among the consequences in this case was the Firm's routine practice of terminating access to Firm Systems.  Dabney has expressed concern that the loosening (or severing) of his ties to Hughes Hubbard will dent his professional reputation.  In particular, Dabney argues that "[b]eing a Retired Partner of a large law firm is an honorific that immediately and unambiguously identifies petitioner to courts,

8

adversaries, friends, family, neighbors, colleagues, students, and others as a person who achieved large law firm partnership, who maintained that station until retirement age, and who acted with the grace that once was expected of partners in large New York law firms." Reply at 3. Dabney also claims that it would be "extremely embarrassing, humiliating, and damaging for [him] to be forced to change his existing court appearances from Retired Partner of [Hughes Hubbard] to solo practitioner unaffiliated with [Hughes Hubbard]." Pet. Br. at 5. But, that is the choice he has made.

The Court cannot credit the claim that Dabney's friends, family, neighbors, and other close associates will somehow forget that he achieved partnership at a large law firm and maintained that station until his retirement simply because—at his election—his affiliation with Hughes Hubbard has been altered and his title has changed. As for the courts and his adversaries, Dabney handles only a few cases and has not suggested an intent to take on any new ones before arbitration concludes. To the extent that the courts before which Dabney has appeared, or the adversaries against whom he has worked, care about his prior partnership status, there is no reason to believe that their knowledge of that status will dissipate in the short time between now and the end of arbitration. In any event, a lawyer suffers no harm in honestly advising others of his affiliation (or lack thereof) with a firm, rather than concealing or otherwise disguising the current state of affairs and misrepresenting his status and affiliation to the courts.

Dabney further testified that his relationship with his clients would be impaired because his professional identity is tied to Hughes Hubbard, and a forcible separation of that relationship would carry a significant stigma. Tr. 28:19-25; 33:3-34:6. But it is not a forceable separation. Dabney elected to retire and refused to engage in discussions that would allow him to continue practicing law at Hughes Hubbard. Moreover, the notion that Dabney's clients would think less

9

of him if they were aware of his altered relationship with the Firm is undercut by Dabney's decision to directly bill one of his clients, rather than bill through Hughes Hubbard. While the Court makes no comment on the ethics or propriety of such action, by billing the client directly for his own account, Dabney made clear to the client that his relationship with the Firm had been altered. Whether Dabney has been doing the same thing with other clients is unclear. But one thing is clear: by advising a client of his severed ties to the Firm, Dabney voluntarily subjected himself to the precise harm that he has asked this Court to prevent on an emergency basis. This underscores that the reputational harm Dabney claims to fear, rather than being incalculable, has a price.

Dabney's claim of irreparable harm is meritless in another respect. Dabney suggests that reputational harm will stem from his inability to refer to himself as a "Retired Partner" of Hughes Hubbard. However, Hughes Hubbard has not stated or otherwise suggested Dabney will be deprived of that privilege, nor has Dabney sought any relief from this Court with respect to his retention of that title. He has asked for relief only with respect to his access to the Firm Systems, and yet, he has not explained why reputational harm will follow from a loss of access to those systems alone. Surely nobody outside the Firm will have any idea whether or not he has Citrix access; and a changed phone number says very little. A different email address is more telling; but Dabney has not explained why anyone with whom he communicates through email would think any less of him now that he has retired and altered his affiliation with the Firm, a natural progression in the course of a career.

In addition to reputational harm, Dabney argues that he "cannot effectively discharge existing client responsibilities without continued, uninterrupted access to [the Firm Systems]." Dabney Decl. ¶ 40. Hughes Hubbard has persuasively explained, however, that there is no reason to believe that losing access to Firm Systems will disrupt Dabney's representation with respect to

his few active client matters. Hughes Hubbard apparently has explained to Dabney that should he elect to become a Retired Partner and cease providing services as Of Counsel, the Firm would work with him to support whatever decisions his remaining clients made, whether that involved transferring the clients to other attorneys at the Firm, transferring the clients to Dabney as a solo practitioner, or working with Dabney in a cooperative co-counsel relationship. Opp. at 16. Indeed, Dabney himself explained that he has worked for the past several years on hiring lateral partners who could help fill his shoes and on transitioning his matters to others at Hughes Hubbard. Tr. 30:9-25; 36:21-24; 84:4-15. A partner retiring from a firm, or otherwise altering his relationship with that firm, is nothing new. There may be inconveniences associated with such a disassociation, but they are too minor and routine to constitute irreparable harm.

      **b.   Likelihood of Success on the Merits**

Dabney asserted a variety of claims in his demand for arbitration, including his claim that he was entitled to retirement benefits and that the Firm's deprivation (or reduction) of such benefits amounted to discrimination. Dabney Decl. I, Exs. 13, 26. The only claim that matters for purposes of this motion for injunctive relief, however, is the claim that the Firm's threat to disable Dabney's access to Firm Systems amounts to unlawful retaliation in violation of the Age Discrimination in Employment Act ("ADEA") and the Employee Retirement Income Security Program ("ERISA"). Dabney also claimed (as relevant here) that the threat of disablement amounts to a breach of the implied covenant of good faith and fair dealing contained in the Partnership Agreement. Dabney has not demonstrated a likelihood of success on these claims.

With respect to the retaliation claims, Hughes Hubbard argues that Dabney will not succeed at arbitration because he does not fit the definition of "employee" as that term is used in the context of the ADEA or ERISA and thus does not fall within the protections of those statutes. Whether an equity partner in a law firm may be deemed an "employee" of the firm has not yet been decided

11

by the Second Circuit. The Supreme Court has explained, however, that whether an individual qualifies as an employee "depends on 'all of the incidents of the relationship . . . with no one factor being decisive.'"[7] *See Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 450 (2003) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324 (1992)).

But while this inquiry is generally fact intensive and case specific, equity partners at law firms have received consistent treatment from other circuit courts which have considered whether such partners qualify as employees. As Hughes Hubbard notes, for instance, the Eighth Circuit recently concluded that an equity partner in a law firm was not an employee of the firm and, as a result, was not covered by the ADEA. *See Von Kaenel v. Armstrong Teasdale, LLP*, 943 F.3d 1139, 1144-45 (8th Cir. 2019). The Fourth Circuit recently came to a similar conclusion, explaining that "[f]or this court to treat [the plaintiff], an equity partner in a conventionally-structured law firm, as an employee would be to assign ourselves the task of single-handedly refashioning the foundation of a prevailing form of legal practice." *Lemon v. Myers Bigel, P.A.*, 985 F.3d 392, 397 (4th Cir. 2021). The Seventh Circuit—seemingly the only other circuit court to consider the issue—has ruled the same way. *See Solon v. Kaplan*, 398 F.3d 629, 633 (7th Cir. 2005) (finding that "no reasonable juror could find that [plaintiff]," who was a partner at a law firm, "was an employee of the firm").

The Court finds these rulings persuasive. And while no two cases have identical facts, all evidence suggests that Hughes Hubbard has a typical bi-level hierarchy, with associates being classic "employees," while the equity partners (unlike typical employees) buy into the firm, share

---

[7] These factors include: (1) whether the organization can hire or fire the individual or set rules and regulations for the individual's work; (2) whether and to what extent the organization supervises the individual's work; (3) whether the individual reports to someone higher in the organization; (4) whether and to what extent the individual is able to influence the organization; (5) whether the parties intended the individual to be an employee, as expressed in written contracts or agreements; and (6) whether the individual shares in the profits, losses, and liabilities of the organization. *Clackamas*, 538 U.S. at 450.

in its profits, and vote on matters with respect to how the firm operates and is governed. Dabney Decl. I, Ex. 2. As such, the Court concludes that Dabney, a former equity Partner of Hughes Hubbard, has not demonstrated a likelihood of success on his claim for retaliation under the ADEA or ERISA because he may well not qualify as an employee of the Firm.[8]

Moreover, there is no evidence that Dabney was targeted, discriminated against, or retaliated against through the plan to disable his access to Firm Systems. That is apparently standard practice at Hughes Hubbard. Tr. 98:10-22. It is true that Hughes Hubbard permitted a handful of other Retired Partners, who were no longer practicing law, to retain their Firm email address and phone number. Tr. 99:3-9. But those were exceptions. Dabney complains of retaliation for being treated like (most) everyone else. He has not proven a likelihood of success on such a claim.

Dabney also argues that the threat to cut off his access to the Firm Systems amounts to a breach of the implied covenant of good faith and fair dealing in the Partnership Agreement. Specifically, Dabney argues that Hughes Hubbard "seeks to prevent [him] from identifying himself, truthfully, as [a Hughes Hubbard] 'Retired Partner' in professional communications before" arbitration has concluded. Reply at 9. However, Hughes Hubbard has not stated an intent to prevent Dabney from identifying himself as a Retired Partner, and that is not what this motion for a preliminary injunction is about. This motion concerns only whether Dabney shall be permitted to practice law using Firm Systems despite becoming, by his own election, a Retired Partner. There was no promise—implied or otherwise—that he could do so. As noted, Dabney

---

[8] To the extent that Dabney's relationship with the Hughes Hubbard in the year following his retirement is relevant, Dabney characterized his relationship with the Firm during that time as being that of a "vendor." Tr. 26:1-16.

13

chose not to engage in a dialogue to renegotiate a further retainer agreement and to continue to practice as a Hughes Hubbard-affiliated lawyer.

In any event, the implied covenant of good faith and fair dealing is violated only when a party "so directly destroy[s] the value of the contract for another party that the acts may be presumed to be contrary to the intention of the parties." *Artists Rts. Enf't Corp. v. Est. of King*, 370 F. Supp. 3d 371, 383 (S.D.N.Y. 2019) (quoting *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)).  While there was a lot of value contained in the Partnership Agreement, not much of it (if any) was affected by Hughes Hubbard's plan to disable Dabney's access to the Firm Systems, as was routine protocol for Retired Partners.  Because Dabney is not likely to show that he has been deprived of receiving value from the Partnership Agreement, he has not shown a likelihood of prevailing on his claim for breach of the implied covenant of good faith and fair dealing.

### c. Balance of Hardships

The equities clearly tip in favor of Hughes Hubbard with respect to Dabney's access to Citrix.  Hughes Hubbard has explained that Retired Partners are not required to remain eligible to practice law by keeping up their bar admission, are not bound by the Firm's restrictions on securities trading and confidentiality, are not required to take cybersecurity training, and, as a result, do not have access to Firm Systems that would give them access to clients' confidential information.[9]  Mayer Decl. at 11.  The Firm has good reason for this policy, as the security of confidential information is paramount to any law firm (or any company for that matter).  Allowing Dabney to retain access to such information raises serious security concerns given that Dabney

---

[9] In his reply brief, Dabney argued that Hughes Hubbard "plainly has the technical ability to limit [his] Citrix access to his own e-mail box contents, personal electronics files, and HHR-maintained electronic files that are pertinent to [his] discharge of existing client commitments." Reply at 10.  At the May 15 hearing, however, Dabney's counsel conceded that nothing had been offered into evidence to support this assertion.  Tr. 107:16-108:5.

14

operates (in some regards, such as billing) as a solo practitioner, who claims to have free reign over his cases now that the Retainer Agreement is no longer in effect. Tr. 77:2-15.

The equities also tip in favor of the Firm with respect to Dabney's access to his email address and telephone number. As previously discussed, the termination of such access appears to have been Firm policy, rather than some unique action targeted at Dabney for the purpose of discrimination or retaliation. The Firm has an interest in being able to execute its policies with some degree of consistency. In any event, the balance of equities has shifted further in favor of Hughes Hubbard since it first advised Dabney of its plan to disable his access to Firm Systems. As came to light during the evidentiary hearing on his requested injunction, Dabney has been making judicial filings in which he holds himself out as a Hughes Hubbard attorney and working for clients using his Hughes Hubbard phone number and email address, all while surreptitiously billing those clients for his own benefit. Indeed, the Firm learned of this fact only when Dabney was asked under oath why he had not kept time records or sent a Hughes Hubbard bill to the client. That Hughes Hubbard has an interest in preventing Retired Partners from accessing their Firm email accounts or telephone numbers, while those same Retired Partners actively evade Firm billing policies, is not difficult to comprehend. The interest is weighty, and clearly overcomes the amorphous reputational injury claimed by Dabney.

### d. Public Interest

The public interest is not heavily implicated by this private controversy between a law firm and a former partner, rendering this final factor neutral.

## CONCLUSION

For the reasons stated above, Dabney's motion for a preliminary injunction is denied. The parties are ORDERED to advise the Court by letter, within one week of this Opinion and Order, whether there are outstanding issues or if the case can be closed.

**SO ORDERED.**

**Date: July 6, 2023**
      **New York, NY**

_____
**MARY KAY VYSKOCIL**
**United States District Judge**